**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NIKOLA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. |
| | ) | |
| v. | ) | |
| | ) | |
| ZapGo, LTD., STEPHEN VOLLER, | ) | |
| CHARLES R. RESNICK, TIM WALDER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

## I.     INTRODUCTION

1.      Plaintiff Nikola Corporation was founded by Trevor Milton to "[t]ransform the transportation industry" by manufacturing alternative fuel vehicles. Nikola's flagship vehicles–the Nikola Two and Nikola Tre – are a hydrogen fuel cell and battery electric semi-trucks, respectively. Nikola's vehicles have received industry praise, including saying, "Nikola Motor is expected to pioneer the penetration of electric-hybrid trucks in the heavy-duty, long-haul segment." Nikola's orders world-wide have jumped to over 14 million pre-orders, which could generate over $10 billion from truck sales. As part of launching its vehicles, Nikola has plans to build a nationwide network of hydrogen fueling and electric charging stations. As part of these plans, Nikola has contemplated partnering with various battery storage manufacturers.

2.      In May 2019, Milton came across an innovative energy storage company, Defendant ZapGo Ltd. ZapGo touts itself as a "high technology" business that builds carbon ion capacitors that act more like batteries than typical supercapacitors.

3.      ZapGo, Stephen Voller (ZapGo's founder and Chief Executive Officer), Charles R. Resnick (ZapGo's President), and Tim Walder (ZapGo's Chief Financial Officer) bragged to Milton that ZapGo had a Generation 3 ("Gen3") carbon-ion cell (or C-Ion cell) "with considerable functional improvements over commercially available supercapacitors or 'ultracapacitors.'" ZapGo, Voller, Resnick and Walder told Milton that if Nikola invested $8 million dollars in ZapGo that ZapGo could develop a Generation 4 ("Gen4") C-Ion cell (doubling the energy storage over Gen3) in a few months.

4.      Relying on Voller's, Resnick's and Walder's representation, Milton was persuaded to have Nikola enter into a Letter of Intent ("LOI") with ZapGo on 31 October 2019. Under the terms of the Letter of Intent, Nikola would "analyze the [C-Ion cells ZapGo developed for Nikola]," and "if [Nikola] determines that the [C-Ion cells] does not perform to reasonable expectations in [Nikola's] sole and absolute discretion," Nikola had the right to terminate the Letter of Intent. A copy of the LOI is attached as Exhibit 1.

5.      Further, Nikola had the right to terminate the Letter of Intent for any reason by notifying ZapGo "in writing" that "it does not intend to proceed with the Acquisition."

6.      With the Letter of Intent in place, Nikola began its due diligence process, having Jason Roycht (Vice President of Technology Development and Strategy) meet with ZapGo.

7.      Nikola also began funding ZapGo's development of the Gen4 C-Ion cell, as set forth according to the funding schedule agreed to in the LOI.  Moreover, the LOI stated that if Nikola determined not to proceed with the ZapGo acquisition and thereby terminate the LOI, the money funded by Nikola to that point would be converted into ZapGo equity.

8.      As Roycht was learning about ZapGo, he discovered on 5 December 2019 that Resnick has been indicted for tax fraud for submitting receipts for prostitutes as business expenses.

Roycht told Tim Walder and Stephen Voller, who claimed they did not know about Resnick's fraudulent actions.

9.      Roycht continued to learn more about ZapGo. ZapGo claimed that it had a deal with Porsche to provide charging stations at Porsche dealerships. While in the UK visiting ZapGo, and at the invitation of Stephen Voller, Roycht met with Porsche in the United Kingdom together with Stephen and Charles to confirm ZapGo's story and the status of the opportunity at Porsche where it became evident that ZapGo did not have a realistic plan to provide Porsche with energy storage solutions.

10.     Nikola continued to fund ZapGo's development of the Gen4 storage technology while in parallel confirming the status of the development and the required development efforts and required budget. Finally, ZapGo provided Nikola on 14 February 2020 a detailed timeline and development plan whereby ZapGo could only demonstrate a 25% improvement from the Gen3 technology by Jan 2021.  ZapGo also referenced the initial ten cells to be provided according to the LOI on the same date as "check to box" samples rather than the desired proof of concepts contemplated. Roycht confronted ZapGo over the minimal improvement in ZapGo's technology. ZapGo responded that it needed at least another year and $8 million more to produce the required "Proof of Concept" development originally contemplated within the LOI.  Furthermore, the documented requirements of the Gen4 Cell were found to not be the basis of the financial plan presented by ZapGo, rather a secondary improvement referred to the "GenX" C-ion cell, was required only 2 years after start of production to achieve the competitive cell figures represented in the ZapGo representations.

11.     Nikola was shocked because ZapGo had told Nikola that the Gen4 cell with a 36 Wh/L (a measure of energy density) would be ready by May 2020 and because ZapGo had never

indicated a second design improvement would be required by 2025, which made the Gen4 cell obsolete only two years after introduction.

12.     Roycht did additional research and discovered that ZapGo was on the brink of bankruptcy even though ZapGo postured itself as a $4 billion company and an "equal" to Nikola.

13.     Based on ZapGo's failure to produce a workable Gen4 C-ion cell, Resnick's indictment for fraud, and ZapGo's poor financial condition, Nikola decided not to acquire ZapGo, and instead opted for the roughly $2.2 million previously paid in development costs to be converted into ZapGo equity.

14.     On 26 February 2020, Milton sent Voller a termination letter because "ZapGo will not be able to deliver a Development Product that performs to our expectations and needs (both as to performance and cost parameters)" because the Gen4 battery did not meet the required specifications and would cost double the amount ZapGo had told Nikola. Attached as Exhibit 2 is a copy of the Termination Letter.

15.     On 8 March 2020, Cameron Moxley of the law firm of Brown Rudnick, sent Nikola a letter on behalf of ZapGo threatening Nikola with litigation because Nikola terminated the Letter of Intent. Moxley argued, without basis, that Nikola had negotiated in bad faith because Nikola had recently announced a merger with a company that would allow Nikola to go public. Attached as Exhibit 3 is a copy of the Moxley's letter.

16.     Nikola's announced merger had nothing to do with its decision to terminate the LOI and not proceed with the ZapGo acquisition. If ZapGo's technology was viable and the related representations accurate, Nikola could have proceed with the ZapGo acquisition in conjunction with the announced merger.

4

17.     In reality, ZapGo had nothing more than interesting research with no ability to commercialize its research. Despite this fact, ZapGo, Voller, Walder and Resnick falsely told Milton and Roycht that it could commercialize that technology in roughly six months after signing the Letter of Intent.

18.     Nikola spent four months pursuing ZapGo and over $2 million to develop a C-ion cell with nothing to show for it.

19.     Nikola has been damaged as a result of ZapGo's, Voller's, Walder's and Resnick's fraud and breach of contract.

## II.     PARTIES, JURISDICTION AND VENUE

### A.     Parties.

20.     Plaintiff Nikola Corporation is a Delaware corporation with its principal place of business at 4141 East Broadway Road, Phoenix, Arizona 85040.

21.     Defendant ZapGo Ltd. is a company based in Oxford, United Kingdom, Genesis Building, Library Avenue, Harwell, Oxford OX11 0SG, United Kingdom.

22.     Defendant Stephen Voller is a resident of Oxford, United Kingdom.

23.     Defendant Charles R. Resnick is a resident of Florida.

24.     Defendant Tim Walder is a resident of Otterbourne, Hampshire, United Kingdom.

### B.     Subject Matter Jurisdiction.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there is complete diversity between Nikola and Defendants, and the jurisdiction amount exceeds $75,000.

### C.     Personal Jurisdiction.

26.     ZapGo has agreed to personal jurisdiction in Delaware, agreeing in a Letter of Intent that it "irrevocably submits" to the state or federal courts sitting in Delaware. Specifically,

ZapGo "irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in the State of Delaware . . . ."

27.    Stephen Voller is the founder and Chief Executive Officer of ZapGo. His conduct is so closely intertwined to the LOI that he is bound to the LOI's jurisdictional paragraph.

28.    Charles R. Resnick was the President of ZapGo. His conduct is so closely intertwined to the LOI that he is bound to the LOI's jurisdictional paragraph.

29.    Tim Walder is the Chief Financial Officer of ZapGo, His conduct is so closely intertwined to the LOI that he is bound to the LOI's jurisdictional paragraph.

**D.    Venue.**

30.    ZapGo, Voller, Resnick and Walder have consented to venue in this Court in the Letter of Intent and venue is therefore proper under 28 U.S.C. § 1391.

**III.    FACTUAL BACKGROUND**

**A.    Nikola Corporation develops innovative hydrogen fuel cell and battery electric semi-trucks.**

31.    Nikola Corporation and its founder, Trevor Milton, want to "transform the transportation industry." Milton and Nikola are developing battery electric and hydrogen fuel cell semi-trucks, electric personal watercraft and all-terrain vehicles, and a battery/hydrogen electric light duty truck. The industry praised Nikola's vehicles, saying, "Nikola Motor is expected to pioneer the penetration of electric-hybrid trucks in the heavy-duty, long-haul segment."





32.     Nikola has plans to build hydrogen and electric charging stations for its innovative vehicles because no stations currently have the capacity to handle refueling or recharging large alternative fuel semi-trucks. Ideally, the charging station would use renewable electricity to convert electricity to hydrogen through electrolysis. The hydrogen is then stored onsite for Nikola customers to fuel their vehicles. In addition, electricity would be stored on site so drivers could charge their battery electric vehicles ("BEV"), which Nikola is also developing.

33.     To meet the large electricity storage needs and as part of Nikola's next generation development, Nikola was interested in a storage solution that balanced energy density and power density. This would allow the storage unit to store a lot of energy while quickly releasing it, which would assist in meeting the demands of customers. Batteries store energy but may charge and

release energy slowly. Capacitors can quickly release power but may not store the energy for a long time.

**B.**   **Trevor Milton read that ZapGo touted its carbon-ion cells and experienced leadership.**

34.    Trevor Milton, Nikola's founder and CEO, was searching for next generation electricity storage solutions in May 2019 when he discovered ZapGo.

35.    Milton read that ZapGo advertises itself as "a high technology business" with "the goal to develop the next generation of batteries beyond lithium." Milton also understood that ZapGo's goal "is to develop a new category of energy storage device called Carbon-Ion or C-Ion. One that is safer, faster charging, does not use rare-earth materials and can be recycled at the end of life." Milton further read that ZapGo touted that "C-Ion are electrostatic or capacitive energy storage devices that use different materials to conventional supercapacitors." And Milton also understood ZapGo's claims that:

> C-Ion is about improving the performance of supercapacitors so they perform like batteries. This is achieved by using different materials than conventional supercapacitors which allow us to retain a long life, excellent power density and fast charging capability of supercapacitors, but also have the energy density of the best performing batteries.[1]

36.    Milton read that ZapGo also claims that its "C-Ion cells are designed for a 30-year operational life and 1 million charge/discharge cycles."

37.    Milton also read that ZapGo was "creating polymer-inorganic composite electrolytes in the form of membranes. Such materials are tailored to contain interconnected nano-sized channels formed by the polymer network for easy ion migration. The polymer network

---

[1] https://zapgo.com/about-us/.

weakly binds the ions to enable fast ion transport. The weak binding and fast ion transport is achieved by creating a network of vacant binding sites in the polymer."

38.     Based on ZapGo's public representations on its website, Milton contacted ZapGo and had conversations with Voller, Resnick and Walder. Voller touted his expertise as "an experienced business leader and recognized authority on energy storage technologies" and launched "the first ever CE-marked hydrogen fuel cell product."

39.     Resnick pointed to his time as Chief Economist for NASA's International Space Station and touted his experience and reputation as giving ZapGo credibility.

40.     Resnick and Voller told Milton that with a modest investment from Nikola, ZapGo would develop ten sample cells in four months with a greater energy density than what ZapGo offered with its current product called Gen3. Resnick and Voller claimed that the next iteration, or Gen4, would more than double the performance of Gen3.

### C.     Milton and Nikola relied on ZapGo's claims about its carbon ion cells to enter a 31 October 2019 Letter of Intent.

41.     Relying on ZapGo's public representations and statements made by Voller, Resnick and Walder, Milton agreed to a Letter of Intent with ZapGo.

42.     The parties signed a Letter of Intent for Nikola to acquire ZapGo on 31 October 2019. Under the terms of the Letter of Intent, "[t]he obligations of the parties hereto to consummate the Acquisition are subject to the negotiation and execution of definitive legal documentation, including, without limitation, the Purchase Agreement. . . . [T]his LOI is intended solely as a basis for further discussion and is not intended to be and does not constitute a legally binding agreement." Paragraphs 3, 5, 10, 11, 12, 14, and 15 survived termination of the LOI.

43.     The tentative purchase price for ZapGo was $56,500,000 in Nikola stock, less certain debt and further negotiation.

44.     Nikola agreed to pay up to $8 million during the due diligence process for ZapGo to develop the Gen4 cells, ten (10) of which would be delivered by 14 February 2020. "Subject to [Nikola's] analysis of the Development Product at Milestone 1, [Nikola] provides draft purchase documents schedules and related employment and non-compete agreements." This $8 million to development of the Gen4 during due diligence was separate from the purchase price.

45.     The Acquisition was "subject to satisfaction of conditions" including the approval of Nikola's Board of Directors, and "satisfactory completion by [Nikola] of a due diligence investigation of [ZapGo]."

46.     If ZapGo met all the development timelines and Nikola was satisfied to proceed with the acquisition after due diligence, the parties agreed the acquisition would close on 17 May 2020.

**D.     Nikola had the right to terminate the business relationship under the Letter of Intent.**

47.     Under Section 5 of the LOI,

> [Nikola] shall analyze the [Gen4 cells that Nikola paid ZapGo to develop] prior to Closing according to milestones in Exhibit B [14 February 2020], and if [Nikola] determines that the [Gen4 cells] does not perform to reasonable expectations in its sole and absolute discretion and decides not to consummate the Acquisition, [Nikola] shall notify the Company of such determination and [ZapGo] shall issue to [Nikola] unrestricted stock or other similar ownership interest in [ZapGo] of a value equal to the Development Costs paid by [Nikola.]

48.     Further, the LOI terminates, among other events, "[u]pon the earlier of . . . (b) the date at which [Nikola] notifies [ZapGo] in writing it does not intend to proceed with the Acquisition." In the event that Nikola provided ZapGo a written termination notice, "this LOI shall terminate and the parties shall be released from all liabilities and obligations with respect to the subject matter hereof . . . ."

### E.     Charles Resnick, Stephen Voller and Tim Walder misrepresented the Gen4 cell development, readiness and finances.

49.     With the LOI in place, Nikola began its due diligence review, meeting several times with Resnick, Voller, Walder and other ZapGo employees and executives including Rachel Eggington.

50.     On or about 29 November 2019, Jason Roycht of Nikola had a telephone call with Charles Resnick, ZapGo's president. Resnick said that the Gen4 cell development timing and production readiness would be complete during 2020, followed by a scale-up phase focusing on prototype and sample units.

51.     Roycht went to England to meet with ZapGo on 4 December 2019. During the meeting, Resnick again reiterated that development of Gen4 would be complete in 2020 with production runs beginning in 2021. Stephen Voller and Rachel Eggington (both of ZapGo) gave Roycht a presentation that day that said Gen4 development would be complete in 2020 and scaling of Gen4 production would take place in 2021.

52.     During the 4 December 2019 meeting, Tim Walder represented that the Gen4 cell would enable ZapGo to realize significant revenue of $4.1 billion by 2024. Walder represented that the financial plan had an EBITDA of 38%. To reach this potential Zapgo would need significantly more funding than contemplated in the LOI due to ongoing production scale up activities.

53.     Resnick, Voller and Walder represented on the 29 November 2019 call and during the 4-5 December 2019 in person visit that ZapGo had a deal with Porsche that was built into ZapGo's financial plan which needed additional funding and increase sales resources.

54.     On 4 December 2019, Resnick, Voller and Walder represented that development and pre-production expenditures were roughly $8 million and would be completed in about 6

months and another $7 million to $12 million was needed to support prototyping and scaling the C-ion cell. With this funding, Resnick, Voller and Walder also represented that ZapGo would generate revenue beginning in 2020 and 2021.

55.     And during the 4 December 2019 visit, Resnick, Voller and Walder represented to Roycht that ZapGo had several customers and products totaling revenue of about $4.5 billion. After the meeting, Roycht requested the details of the figures built into ZapGo's financial representations and models. On 5 December 2019, Roycht visited Porsche UK together with Resnick and Voller at the request of Voller in order to see the opportunity and convince Roycht to lobby for additional funding and support from Nikola.

56.     While at Porsche UK, Roycht met with Ed Carpenter, E-Performance Manager of Porsche UK.  During this meeting, it became evident that there was no impending chance of ZapGo doing a deal with Porsche because Porsche Germany and not Porsche UK was responsible for sourcing charging units.  Porsche also required physical samples of the Gen4 cells in the next months to further the discussions between Porsche and ZapGo, but ZapGo was not ready to produce the Gen4 cells or the requested charging units.  After the Porsche meeting, ZapGo did not bring up the Porsche "opportunity" again but *never* adjust ZapGo's financials.

**F.      Nikola discovered that ZapGo's executive, Charles Resnick, was indicted on tax fraud for deducting money he paid to prostitutes.**

57.     During his visit to ZapGo's headquarters in Oxford, England, Roycht was researching ZapGo on the night of 5 December 2019 when he discovered that Charles Resnick was indicted on 11 April 2019 by the U.S. Attorney for the Middle District of Florida.

58.     The indictment alleged that Resnick arranged to meet escorts, prostitutes and call girls during business trips through Europe and the United States while he worked for NASA's

Center for the Advancement of Science in Space. Resnick would then submit the expenses for the prostitutes as a business expense.

59.     Specifically, the indictment alleged that Resnick "did knowingly and willfully devis[ed] and intend[ed] to scheme and artifice" to defraud and obtain money through fraudulent pretenses and promises to:

- "Arrange to meet escorts and prostitute in various locations, including in Europe (e.g., London) and in the United States of America (e.g., New York City);"

- "Fabricate and caused to be fabricated documents, including hotel letters and altered and cause to be altered other documents, including receipts, in order to arrange and conceal meetings with escorts and prostitutes;"

- "Submit and cause to be submitted materially false and fraudulent" documents for reimbursement;"

- "receive and caused to be received CASIS reimbursements for travel expenses and related expenses incurred in connection with escort and prostitution activities;" and

- "misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of acts done in furtherance of the scheme.

60.     A Washington Post article from 18 April 2019, detailed that Resnick was charged by the federal prosecutors for fraud on 11 April 2019 and was arrested on 12 April 2019. Resnick was released on bond on 12 April 2019.

61.     Roycht was shocked to find that a person with Resnick's history was the president of ZapGo. Roycht asked Voller and Walder when Roycht returned to England on 16 December 2019 if they knew about Resnick's history. They claimed they did not and terminated Resnick.

G.     **Nikola never received Gen4 Cell as required under the Letter of Intent.**

62.     After finding out about Resnick, Nikola was wary of ZapGo but Voller and Walder doubled down on their previous representations about the technology, telling Roycht and Nikola that the Gen4 cell would be completed on time.

63.     ZapGo requested that Panasonic that may help produce parts of ZapGo's cell and collaborate on technology development.

64.     Roycht arranged for Nikola to join ZapGo in meeting with Panasonic. That meeting took place on 27 January 2020 in Japan with Jason Roycht and Will Van Curen of Nikola and Hugh Sutherland of ZapGo in attendance. During the meeting, it was apparent that ZapGo's technology required several months of trials together with Panasonic and the development time and budget ZapGo provided was not realistic.

65.     Roycht then visited ZapGo in England again, this time with Britton Worthen, Will Van Curen and other Nikola employees, as well as outside counsel, to discuss open due diligence items on 3 February through 6 February 2020. During the meetings, Roycht and Worthen told ZapGo that Nikola board approval – a condition precedent under the LOI to proceed with the acquisition – required a demonstration of the Gen4 cells.

66.     Voller responded that ZapGo could not finalize its development plans for the Gen4 cell because they did not understand the charging requirements. This shocked Roycht and the other Nikola representatives in attendance because ZapGo had always represented that it had a path to develop its Gen4 cell, without need for additional input from Nikola.  Why would a battery development company ask a vehicle development company for specifications to develop its battery?  This question was concerning to Nikola and confirmed its fears that ZapGo did not have a clear path to develop its own technology.

67.     Indeed, during initial conversations between Nikola and ZapGo management prior to entering into the LOI, ZapGo stated it was close to reaching full development of the Gen4 cell – all that was needed was time and money.  As a result of this February meeting at ZapGo's

headquarters in England, it now became clear to Nikola clear that ZapGo management's early and often repeated representations were not true.

68.     On 13 of February 2020, Roycht and the ZapGo team assembled a comprehensive summary of the development status and ZapGo sent a summary to Nikola of the revised development schedule with precise performance figures of the Gen4 cell, which did not show the claimed 36 Wh/L until after the development phase, which ended at demonstration of  22 Wh/L with the final improvements coming via "additional performance enhancements."  Nikola employees were shocked to see the development timeline that ZapGo had repeatedly said would occur was not accurate. Instead of having development for the Gen4 cell completed in 2020, it would take until at least 2021. Production would not happen until at least 2022. ZapGo then introduced a new product, "Gen X" that would not be ready until 2025, meaning that the Gen4 cell would only be useful for 2-3 years.

69.     The incremental product improvements and other financial assumptions that ZapGo had presented to Milton before the LOI and to Roycht during the 4 December 2019 meeting were not only inaccurate but blatantly misleading.

70.     ZapGo offered Nikola ten cells which represented the physical delivery of cells required under the LOI, for review on 18 February 2020. The C-Ion cells were nowhere close to meeting the requirements that ZapGo and Nikola had agreed to within the context of the LOI nor previous timelines presented by the ZapGo team. This was referred to previously by Voller as "check the box" and caused high alarm within the Nikola team that ZapGo management was not acting in good faith.

71.    On the 21 February 2020, Roycht sent an email to Voller summarizing the latest ZapGo representations and the associated risks and accumulated variations since entering into the LOI, which Voller did not deny.

**H.    Nikola exercised its right to terminate the business relationship.**

72.    Because of ZapGo's misrepresentations and failure to provide suitable demonstration units or a reasonable plan to deliver development results within the timing and costs specified within the LOI, Nikola decided to terminate the LOI with ZapGo.

73.    On 26 February 2020, Milton sent a letter to Voller saying, "[W]e have been forced to conclude that ZapGo will not be able to deliver a Development Product that performs to our expectations and needs (both as to performance and cost parameters)."

74.    The Development Product would cost at least another $8 million for a total of $16 million, which is double the $8 million ZapGo had quoted Nikola in connection with the LOI.

75.    Further the Development Product did not meet the requirements set during the 17 December 2019 meeting.

76.    At the time Nikola terminated the LOI, it had paid $2,181,508 in development costs.

**I.    ZapGo threatened Nikola with a lawsuit to cover up ZapGo's failure to perform.**

77.    In response to Nikola exercising its rights under the LOI, Cameron Moxley of Brown Rudnick sent Nikola a demand letter on 8 March 2020 on behalf of ZapGo. Moxley said that "ZapGo intends to take all steps to enforce its rights. ZapGo expects to commence an action against Nikola soon . . . ." Moxley accused Nikola of negotiating in bad faith because a week after terminating the LOI with ZapGo, Nikola announced a merger with VectoIQ that would result in Nikola going public.

78.    Contrary to Moxley's accusation, Nikola's announced merger had nothing to do with termination of the ZapGo LOI.

79.    Following the Moxley letter, Voller and Walder had a telephone conference with Worthen and Roycht.  It was clear from this phone call (and in line with Moxley's veiled threat in his 8 March letter  and 16 March email to Nikola outside counsel) that ZapGo's intent was to pressure Nikola into a settlement or threaten a lawsuit thinking it would hurt Nikola's current merger agreement.

## IV.    CAUSES OF ACTION

### COUNT I
### Breach of Contract (Against ZapGo)

80.    All previous allegations in the Complaint are incorporated by reference as if fully set forth in their entirety.

81.    The LOI, signed on 31 October 2019, is a valid contract between Nikola and ZapGo.

82.    The LOI required ZapGo to develop a Gen4 C-Ion cell in return for Nikola paying $8 million for development costs. ZapGo was required to provide ten units to Nikola by 14 February 2020

83.    ZapGo never provided units that met the agreed upon specifications. Instead, ZapGo provided "check-the-box" units.

84.    The LOI stated:

Purchaser shall analyze the Development Product prior to Closing according to milestones in Exhibit B, and if Purchaser determines that the Development Product does not perform to reasonable expectations in its sole and absolute discretion and decides not to consummate the Acquisition, Purchaser shall notify the Company of such determination and the Company shall issue to Purchaser unrestricted stock or other similar ownership interest in the

Company of a value equal to the Development Costs paid by Purchaser.

85.     On 26 February 2020, Milton requested that Voller and ZapGo convert Nikola's development costs into equity.

86.     ZapGo has refused to convert Nikola's payment into equity and has thus breached the LOI

87.     Nikola has performed all conditions, covenants and promises that could reasonably be performed on its part in accordance with the LOI.

88.     As a direct and proximate result of ZapGo's breach, Nikola has suffered damages in an amount to be proven at trial.

## COUNT II
### Fraud (as to all Defendants)

89.     All previous allegations in the Complaint are incorporated by reference as if fully set forth in their entirety.

90.     On or about 29 November 2019, Jason Roycht of Nikola had a telephone call with Charles Resnick, ZapGo's president. Resnick said that the Gen4 cell development timing and production readiness would be complete within 2020, followed by a scale up phase focusing on prototype and sample units.

91.     Roycht went to England to meet with ZapGo on 4 December 2019. During the meeting, Resnick again reiterated that development of Gen4 would be complete in 2020 with production runs beginning in 2021. Stephen Voller and Rachel Eggington (both of ZapGo) gave Roycht a presentation that said Gen4 development would be complete in 2020 and scaling of Gen4 production would take place in 2021.

92.     During the 4 December 2019 meeting, Tim Walder represented that the Gen4 cell would have incremental product improvements in energy year after year. Walder represented that the financial plan had an EBITDA of 38%.

93.     Resnick, Voller and Walder represented on the 29 November 2019 call and during the 4-5 December 2019 in person visit that ZapGo had a deal with Porsche that was built into ZapGo's financial plan.

94.     On 4 December 2019, Resnick, Voller and Walder represented that development and pre-production expenditures were roughly $8 million and would be completed in about 6 months. Resnick, Voller and Walder also represented that ZapGo would generate revenue beginning in 2020 and 2021.

95.     And during the 4 December 2019 visit, Resnick, Voller and Walder represented to Roycht that ZapGo had several customers and products totaling revenue of about $4.5 billion.

96.     Upon information and belief, ZapGo, Resnick, Voller and Walder knew that the Gen4 C-Ion cell samples would not be completed by 14 February 2020 or 31 March 2020, would cost more than $8 million to develop, and that ZapGo's financial statements were false.

97.     ZapGo, Resnick, Voller and Walder knew the representations they made to Roycht, Milton and Nikola were false.

98.     ZapGo, Resnick, Voller and Walder intended to and did deceive Nikola to alter its position.

99.     Nikola relied on these statements and did alter its position including by entering the LOI and paying roughly $2.2 million in developmental costs to ZapGo.

100.    Nikola's reliance on ZapGo's, Resnick's, Voller's and Walder's statements was reasonable.

101.    Had Nikola known of the falsity of ZapGo's, Resnick's, Voller's and Walder's statements and their true intentions, it never would have entered into the LOI.

102.    Nikola was injured by ZapGo's, Resnick's, Voller's and Walder's fraud.

103.    Nikola's reliance on ZapGo's, Resnick's, Voller's and Walder's statements was a substantial factor in causing its harm.

104.    As a result of ZapGo's, Resnick's, Voller's and Walder's fraud, Nikola has been damaged in an amount to be proven at trial.

105.    ZapGo's, Resnick's, Voller's and Walder's conduct was intentional, willful and malicious and was intended to cause injury to Nikola. Nikola is therefore entitled to an award of exemplary and punitive damages in an amount to be determine at the time of trial.

### COUNT III
### Negligent Misrepresentation (as to all Defendants)

106.    All previous allegations in the Complaint are incorporated by reference as if fully set forth in their entirety.

107.    ZapGo, Resnick, Voller and Walder had a pecuniary duty to provide accurate information to Nikola in connection with Nikola conducting due diligence for a potential acquisition of ZapGo.

108.    On or about 29 November 2019, Jason Roycht of Nikola had a telephone call with Charles Resnick, ZapGo's president. Resnick said that the Gen4 cell development timing and production readiness would be complete within 2020, following by a scale up phase focusing on prototype and sample units.

109.    Roycht went to England to meet with ZapGo on 4 December 2019. During the meeting, Resnick again reiterated that development of Gen4 would be complete in 2020 with production runs beginning in 2021. Stephen Voller and Rachel Eggington (both of ZapGo) gave

Roycht a presentation that said Gen4 development would be complete in 2020 and scaling of Gen4 production would take place in 2021.

110.    During the 4 December 2019 meeting, Tim Walder represented that the Gen4 cell would have incremental product improvements in energy year after year. Walder represented that the financial plan had an EBITDA of 38%.

111.    Resnick, Voller and Walder represented on the 29 November 2019 call and during the 4-5 December 2019 in person visit that ZapGo had a deal with Porsche that was built into ZapGo's financial plan.

112.    On 4 December 2019, Resnick, Voller and Walder represented that development and pre-production expenditures were roughly $8 million and would be completed in about 6 months. Resnick, Voller and Walder also represented that ZapGo would generate revenue beginning in 2020 and 2021.

113.    And during the 4 December 2019 visit, Resnick, Voller and Walder represented to Roycht that ZapGo had several customers and products totaling revenue of about $4.5 billion.

114.    Upon information and belief, ZapGo, Resnick, Voller and Walder knew that the Gen4 C-Ion cell samples would not be completed by 14 February 2020 or 31 March 2020, would cost more than $8 million to develop, and ZapGo's financial statements were false.

115.    ZapGo, Resnick, Voller and Walder knew the representations they made to Roycht, Milton and Nikola were false.

116.    ZapGo, Resnick, Voller and Walder failed to exercise reasonable care in obtaining or communicating the information to Nikola.

117.    Nikola relied on these statements and did alter its position including by entering the LOI and paying roughly $2.2 million in developmental costs to ZapGo.

118.    Nikola's reliance on ZapGo's, Resnick's, Voller's and Walder's statements was reasonable.

119.    Had Nikola known of the falsity of ZapGo's, Resnick's, Voller's and Walder's statements and their true intentions, it never would have entered into the LOI.

120.    Nikola was injured by ZapGo's, Resnick's, Voller's and Walder's negligent misrepresentations.

121.    Nikola's reliance on ZapGo's, Resnick's, Voller's and Walder's statements was a substantial factor in causing its harm.

122.    As a result of ZapGo's, Resnick's, Voller's and Walder's negligent misrepresentations, Nikola has been damaged in an amount to be proven at trial.

123.    ZapGo's, Resnick's, Voller's and Walder's conduct was malicious. Nikola is therefore entitled to an award of exemplary and punitive damages in an amount to be determine at the time of trial.

### COUNT IV
### (Unjust Enrichment as to all Defendants)

124.    All previous allegations in the Complaint are incorporated by reference as if fully set forth in their entirety.

125.    Nikola paid ZapGo roughly $2.2 million in development costs for development of ZapGo's Gen4 C-Ion cells toward the specifications established in December 2019. Therefore, ZapGo has been enriched.

126.    Nikola has never received any completed Gen4 C-Ion cells or, alternatively, equity in ZapGo, and has been impoverished as a result.

127.    There is a relationship between ZapGo's enrichment and Nikola's impoverishment.

128.    ZapGo lacks justification for the enrichment.

129.   Nikola lacks a remedy provided by law.

## COUNT V
## Declaratory Judgment

130.   All previous allegations in the Complaint are incorporated by reference as if fully set forth in their entirety.

131.   Nikola and ZapGo signed a LOI on 31 October 2019.

132.   Nikola terminated the LOI on 26 February 2020.

133.   ZapGo via its counsel at Brown Rudnick has alleged that Nikola has breached the LOI and the covenant of good faith and fair dealing and has threatened to sue Nikola.

134.   An actual controversy exists between ZapGo and Nikola regarding: (1) whether the LOI is terminated; and (2) whether the Nikola has breached the LOI and the covenant of good faith and fair dealing.

135.   Nikola is entitled to a declaratory judgment given the immediacy and reality of the controversy.

## V.   **PRAYER FOR RELIEF**

WHEREFORE, Nikola prays for relief including the following:

A.   A judgment that Defendants have breached the LOI with Nikola;

B.   A judgment that Defendants have committed fraud;

C.   A judgment that Defendants have negligently misrepresented facts to Nikola;

D.   A judgment awarding general, actual, special, compensatory, consequential and statutory damages in an amount to be determined at the time of trial;

E.   A judgment awarding Nikola the $2,181,508 it paid to ZapGo as restitution;

F.   An order rescinding the Letter of Intent;

G.      A judgment awarding exemplary and punitive damages due to Defendants' intentional, willful, and malicious misconduct;

H.      An order finding that Nikola has not breached the LOI;

I.      An order finding that the LOI is terminated;

J.      Alternatively, an order converting Nikola's developmental costs into equity in ZapGo; and

K.      Any other remedy to which Nikola may be entitled or that the Court deems just and proper.

Dated:  March 17, 2020

*Of Counsel:*

Leo R. Beus (Pro Hac Vice forthcoming)
K. Reed Willis (Pro Hac Vice forthcoming)
BEUS GILBERT MCGRODER PLLC
701 North 44th Street
Phoenix, AZ 85008
Phone: 480-429-3000
lbeus@beusgilbert.com
rwillis@beusgilbert.com

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ David A. Jenkins*
David A. Jenkins (No. 932)
Kelly A. Green (No. 4026)
1000 West Street, Suite 1501
Wilmington DE 19801
Phone: 302-652-8400
daj@skjlaw.com
kag@skjlaw.com

*Attorneys for Plaintiff Nikola Corporation*